1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

JERIMOND HOWARD,

Defendant.

Case No.  20-cr-00327-CRB-1

**ORDER DENYING MOTION TO SUPPRESS**

Defendant Jerimond Howard is charged with being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1).  Police officers discovered the ammunition after following Mr. Howard's vehicle to a dead-end street, detaining him, and searching behind a fence.  Mr. Howard argues that his detention was improper and unlawfully prolonged.  Mr. Howard also argues that the officers violated his Miranda rights when they questioned him at the scene.  In light of these alleged violations, Mr. Howard moves to suppress (1) statements Mr. Howard made at the scene, (2) statements Mr. Howard made later at the police station, (3) the gun and ammunition police found behind the fence, and (4) any evidence the police obtained from his car.  Mr. Howard also requests an evidentiary hearing.

The Court heard argument from the parties on February 17, 2021 and then invited supplemental briefing.  Having carefully considered the issues raised in the original briefing, at oral argument, and in the supplemental briefing, the Court now denies the motion to suppress.

I.      **BACKGROUND**

   A.      **Officers Follow and Detain Mr. Howard on a Dead-End Street**

   On the afternoon of December 2, 2019, San Francisco Police Department Officers Fredrick Smally and Ronney Freeman were on patrol in a marked patrol car in the Bayview district.

United States District Court
Northern District of California

1   Overbeck Decl. (dkt. 25) Ex. A ("Smally Decl.") ¶ 5.  Both officers were aware that the Bayview

2   district has a high volume of violent crime and firearms-related crime.  Id. ¶ 6; Overbeck Decl. Ex.

3   B ("Freeman Decl.") ¶ 6.  While travelling northbound on Keith Avenue, the officers observed a

4   vehicle travelling towards them in the opposite direction.  Smally Decl. ¶ 7; Freeman Decl. ¶ 7.

5   This vehicle raised the officers' suspicion because, even though it was a cloudy day, the driver had

6   put his visor down.  Id.  The officers were aware that some individuals lower their visors to avoid

7   being recognized by law enforcement or filmed by law enforcement cameras.  Id.

8       Officer Smally decided to make a U-turn to follow the car.  Smally Decl. ¶ 8.  As soon as

9   he made a U-turn, the officers observed the car accelerate through the stop sign at the four-way

10  intersection between Keith Street and Shafter Avenue without stopping.  Id.; Freeman Decl. ¶ 8.

11  The officers then observed the car make a quick left turn at high speed without using a turn signal.

12  Smally Decl. ¶ 9; Freeman Decl. ¶ 9.  Believing that the driver was trying to evade them, Officer

13  Smally took the left turn and attempted to follow the car.  Id.  Due to the speed at which the car

14  was travelling, both officers lost sight of it.  Id.  Officer Smally then began to canvas the area.

15  Smally Decl. ¶ 10; Freeman Decl. ¶ 10.  After 1 to 2 blocks, the officers spotted the car on Ingalls

16  Street.  Id.  The officers observed the car make a left on Yosemite Avenue, and they continued to

17  follow it.  Id.  Yosemite Avenue turns into Hawes Street, which then intersects with Armstrong

18  Avenue.  Freeman Decl. ¶ 11.  As the officers reached this intersection, they observed the car

19  stopped in the dead-end of Armstrong Avenue, to their left.  Smally Decl. ¶ 11; Freeman Decl. ¶

20  11.  The officers estimated that the car had been ahead of them by about a minute.  Id.

21      Officer Smally drove up to the car and activated his patrol lights.  Smally Decl. ¶ 11.  The

22  officers observed that the car was still running, and that the driver's side door had been left open.

23  Id. ¶ 12; Freeman Decl. ¶ 12.  The driver of the car had left it in the middle of the road without

24  legally parking it.  Id.; Overbeck Decl. Ex. D ("Freeman BWC") at 0:35.  The officers also

25  observed a person on the left side of the road near some bushes up against the side of a warehouse.

26  Smally Decl. ¶ 12; Freeman Decl. ¶ 12; Moel Decl. Ex. A ("Incident Report") at 4 of 5.  The

27  person saw the officers and walked towards them with his hands in the air.  Smally Decl. ¶ 12;

28  Freeman Decl. ¶ 12; Overbeck Decl. Ex. C ("Smally BWC") at 0:29.  The person, later identified

as the defendant Jerimond Howard, was dressed in a matching green track suit and bright white shoes, now caked with mud. Smally Decl. ¶ 13; Freeman Decl. ¶ 13; Smally BWC at 0:29. The officers also observed a fresh scratch on Mr. Howard's face. Smally Decl. ¶ 16. The officers believed that Mr. Howard appeared out of place because the area was a muddy industrial area with little foot traffic. Smally Decl. ¶ 13; Freeman Decl. ¶ 13. Officer Smally placed Mr. Howard in handcuffs. Smally Decl. ¶ 15; Smally BWC at 0:31–0:47.

**B.     Officers Summon Backup and Speak with Mr. Howard**

Following Mr. Howard's detention, Officer Freeman asks Mr. Howard, "What you was running for?" Freeman BWC at 0:50–0:52. Mr. Howard answers "I wasn't running." Id. at 0:53–0:55. Officer Smally then seats Mr. Howard on the bumper of the police vehicle. Smally Decl. ¶ 16; Smally BWC at 1:08–1:28. After Mr. Howard is seated, Officer Smally and Mr. Howard have the following exchange:

Smally: Where you from, man?

Howard: I'm on probation.

Smally: Say what?

Howard: I'm on probation. I didn't run, though.

Smally: I said [crosstalk] I said where you from?

Howard: I'm from nowhere.

Smally: You're from, you aren't from out here?

Howard: Yeah, I'm from the city but I don't really…

Smally: What happened to your face?

Howard: [sigh] [inaudible]

Smally BWC at 1:32–1:50.

As this conversation is taking place, Officer Freeman is communicating the officers' location to dispatch, running a check on Mr. Howard's license plate, and requesting additional officers to help search for any contraband that Mr. Howard may have discarded. Freeman Decl. ¶ 14; Freeman BWC at 0:31–3:12.

Upon hearing over the radio that the officers were requesting backup, Mr. Howard asks

United States District Court
Northern District of California

Officer Smally, "What's the problem?"  Smally BWC at 2:35–2:37.  Officer Smally responds,

"You was driving too fast man, blowing stop signs and everything."  Id. at 2:38–2:41.  "No bro,"

Mr. Howard responds.  Id. at 2:41.  "Yeah, you didn't know?" Officer Smally replies.  Id. at 2:42–

2:45.  Shortly after this conversation, Officer Freeman walks towards an area next to the

warehouse to look for discarded contraband.  Freeman BWC at 3:20–4:00; Freeman Decl. ¶ 15.

During this time, Officer Freeman continues to communicate with the dispatcher about the

registration status of Mr. Howard's vehicle.  Freeman BWC at 4:04–4:49.

As Officer Freeman speaks with the dispatcher, Officer Smally is talking on the phone

with another officer and relaying his suspicions that Mr. Howard had "[thrown] something over a

fence over here."  Smally BWC 4:09–4:43.  Mr. Howard interjects, saying "I didn't even go by the

fence."  Id. at 4:44–4:46.  Shortly thereafter, Officer Freeman and Mr. Howard have the following

exchange:

> Freeman: What you run for?
>
> Howard: I didn't even run.
>
> Freeman: You didn't?  Why you got scratches?
>
> Howard: you guys are [inaudible]
>
> Freeman: You got your Air Maxes all muddy.  You ran out the car.  What you run for?
>
> Howard: I never ran.
>
> Freeman: Huh?
>
> Howard: I didn't even see y'all.
>
> Freeman: I know, but
>
> Howard: I'm, I'm on probation.
>
> Freeman: So, you didn't see us, so you just ran for no reason into the mud?
>
> Howard: I [crosstalk] I didn't see y'all.
>
> Freeman: I know, so what's the point of you going out here?  You don't work back here.
>
> Howard: I'm going to [inaudible] … to right there [nodding towards the side of the
> warehouse].
>
> Freeman: For what?

United States District Court
Northern District of California

1       Howard: To try, to try to piss.

2       Freeman: Really?  You think I'm gonna buy that though?

3       Howard: [shrugs]

4       Freeman: Come on man.  You tried to piss?  So why your hands come straight up as soon

5       as we get here, if you was trying to piss.

6       Howard: Cuz y'all shoot people.  Y'all pulled up with the lights on.

7       Freeman: We shoot people? I mean, you been shot by us?

8       Howard: No, I'm not saying you personally.

9       Freeman: Anybody you know personally been shot by us?

10       Howard: Um I've seen, I've seen a guy get killed…

11       Freeman: [crosstalk] I don't think so.

12       Howard: …In my neighborhood.

13  Freeman BWC at 5:31–6:33.

14       While this conversation is taking place, Officer Smally is performing a wants and records

15  check on Mr. Howard using the police vehicle's computer terminal.  Smally Decl. ¶ 18; Smally

16  BWC at 5:50–8:15.  While Officer Smally is performing this check, the first backup unit arrives.

17  Freeman BWC at 6:35–6:45.

18       As an officer with the backup unit talks to Officer Smally, Officer Freeman asks Mr.

19  Howard, "Whose car is that?"  Id. at 7:20–7:21.  Mr. Howard's response is inaudible.  Id. at 7:21–

20  7:22.  Officer Freeman asks, "What you on probation for?"  Id. at 7:28–7:30.  Mr. Howard does

21  not appear to respond.  Id. at 7:30–7:33.  Officer Freeman and Mr. Howard then have the

22  following brief exchange:

23       Freeman: So, if I check back there, it ain't gonna be no pistol?

24       Howard: Back where?

25       Freeman: Where you came from.  Yeah?  You know we're going to search the hell out of

26       it.  [inaudible] let you know now so we can just…

27       Howard: No, I wasn't even around there.

28  Id. at 7:34–7:50.

As the backup officers arrive, Officer Freeman begins to discuss the upcoming search.  He warns the other officers that they will have to deal with thick mud.  Id. at 9:32–9:39.  Mr. Howard then asks, "so if y'all don't find nothing, are you still taking me?"  Id. at 10:14–10:16.  Officer Freeman responds, "Probably not."  Id. at 10:17–10:20.  An unidentified officer arriving for backup then asks Mr. Howard, "You from out here?"  Id. at 10:31.  Before Mr. Howard can respond, Officer Freeman says, "Oceola, all day."  Id. at 10:32–10:34.  The following exchange then occurs:

> Freeman: He be on there all day.
>
> Howard: I'm not from there though.
>
> Freeman: You stay on that street all day. You don't got nothing better to do than hang out.
>
> Howard: I'm not from there.  I'm not from there.
>
> Freeman: Where you from?
>
> Howard: That's just my [inaudible].
>
> Freeman: So, where you from then?
>
> Howard: From the city.
>
> Freeman: Then you gon' be from Oceola because that's … Every time I see you, you always on Oceola.

Id. at 10:35–10:53.

Officer Freeman then turns to another officer on the scene and explains that Mr. Howard had "saw us behind him" and was "driving off."  Id. at 10:57–11:03.  Mr. Howard interjects, "No, I didn't see y'all behind me."  Id. at 11:02–11:04.  Officer Freeman then tells the other officer that Mr. Howard had "[came] back with his hands up" when Officer Freeman and Officer Smiley pulled up.  Id. at 11:19–11:21.  Mr. Howard interjects, "I mean you got your lights on.  I see the police, I come on out."  Id. at 11:24–11:27.

Half a minute later, Officer Freeman asks Mr. Howard, "Is this your car?"  Id. at 12:06–12:07.  Mr. Howard responds, "It's my girl's."  Id. at 12:07–12:09.

### C.     Officers Locate a Firearm and Ammunition

After running into technical problems trying to determine Mr. Howard's conditions of

United States District Court
Northern District of California

6

United States District Court
Northern District of California

release on the police vehicle's computer terminal, Officer Smally gets out of the car and prepares to conduct the search.  Smally BWC at 11:00–11:32.  Smally describes to the arriving officers the area that they will need to search and asks one of the officers to stay with Mr. Howard.  Id. at 11:33–12:16.  Officer Smally and several other officers then walk around the side of the warehouse and pass through a chain link fence.  Smally BWC at 12:17–13:36.

Officer Freeman comments to another officer that Officer Smally and the others are "searching too far down."  Freeman BWC at 13:47–13:51  He and the other officer look in the bushes up against the side of the warehouse.  Id. at 14:15–14:48.  However, just a few seconds into Officer Freeman's search, Officer Smally finds a firearm and a magazine containing ammunition on the other side of the chain link fence.  Smally Decl. ¶ 19; Smally BWC at 14:28–14:36.

After the discovery of the gun and magazine, the officers arrest Mr. Howard and transport him to Bayview Station.  Smally Decl. ¶ 20.  At Bayview Station, Mr. Howard is interviewed by a different group of police officers.  Moel Decl. (dkt. 21-1) Ex. C.  He is Mirandized and verbally states that he understands his rights.  Id. at 1–2.  At one point during the interview, Mr. Howard says "I'm just kind of afraid to put it down."  Id. at 14.  This comment appears to be in reference to the firearm.  Mr. Howard's car is also taken back to Bayview Station where officers impound it and conduct an inventory search.  Smally Decl. ¶ 20.  Subsequent testing would reveal Mr. Howard's DNA on the gun.  Crim. Complaint (Dkt. 1) at 6.

### D.   Procedural History

Mr. Howard is later indicted for being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1).  Indictment (dkt. 14).  On December 16, 2020, Mr. Howard filed a motion to suppress several categories of evidence.  MTS (dkt. 21) at 4.  The Court heard argument from the parties on February 17, 2021.  At the hearing, the Court raised the question of whether the police lawfully seized the gun because the gun was abandoned.  The Court invited supplemental briefing on this subject, which Mr. Howard submitted on February 26th, 2021, and the government responded to on March 4, 2021.  Supp. Brief (dkt. 32); Supp. Response (dkt. 33).

## II.   LEGAL STANDARD

The Fourth Amendment protects the "right of the people to be secure in their persons,

1    houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV.

2    Police may stop a person where they possess a reasonable suspicion based on "specific and

3    articulable facts" that the person is connected with criminal activity.  Terry v. Ohio, 392 U.S. 1, 21

4    (1968).  Stops may last only as long as is reasonably necessary to carry out the "mission" of the

5    stop.  United States v. Gorman, 859 F.3d 706, 714 (9th Cir. 2017).  Unless an exception applies,

6    the exclusionary rule prevents unlawfully obtained evidence from being introduced at trial against

7    the person whose Fourth Amendment rights were violated.  See Mapp v. Ohio, 367 U.S. 643, 655

8    (1961).  This includes all evidence "come at by exploitation of that illegality."  Wong Sun v.

9    United States, 371 U.S. 471, 488 (1963) (internal quotations omitted).

10       The Fifth Amendment protects a suspect from being "compelled in any criminal case to be

11   a witness against himself."  U.S. Const. Amend. V.  In Miranda v. Arizona, the Supreme Court set

12   forth "concrete constitutional guidelines" to implement this guarantee.  384 U.S. 436, 442 (1966).

13   Under Miranda, a suspect subject to a custodial interrogation must be "adequately and effectively

14   appraised of his rights."  United States v. Williams, 435 F.3d 1148, 1151 (9th Cir. 2006) (quoting

15   Miranda, 384 U.S. at 479).  For the purposes of Miranda, "'custody' is a term of art that specifies

16   circumstances that are thought generally to present a serious danger of coercion."  Howes v.

17   Fields, 565 U.S. 499, 508–09 (2012).  If law enforcement conducts a custodial interrogation

18   without adequately informing the suspect of these rights, then "his statements may not be admitted

19   as evidence against him."  Williams, 435 F.3d at 1152.

20   **III.    DISCUSSION**

21       Mr. Howard argues that the officers violated his constitutional rights in three respects.

22   First, he argues that the officers detained him without reasonable suspicion. MTS at 2.  Second,

23   he contends that the officers unlawfully prolonged his detention.  Id.  Third, he argues that the

24   officers interrogated him without informing him of his Miranda rights.  Id.  In supplemental

25   briefing, the parties addressed the issue of whether Mr. Howard has standing to challenge the

26   seizure of the firearm found on the scene.  Supp. Brief; Supp Response.  Mr. Howard requests an

27   evidentiary hearing on these issues.  MTS at 2.

28       The Court denies the motion and declines to hold an evidentiary hearing.  The defense has

8

failed to identify a contested issue of fact that could change the outcome of the suppression analysis.  Based on the uncontested facts, Mr. Howard's detention was proper and not unlawfully prolonged, and the officers' questioning at the scene was not the type of questioning that requires Miranda warnings.  Mr. Howard also lacks standing to challenge the officers' seizure of the gun.

>       **A.**      **Lawfulness of the Stop**

>               **1.**      **Reasonable Suspicion**

Mr. Howard argues that the officers violated his rights when they detained him on Armstrong Avenue.  MTS at 4.  However, based on the uncontested facts, the officers had reasonable suspicion to justify Mr. Howard's detention.

"Although police generally need probable cause to search or seize a person, there exists a limited exception for brief investigatory stops."  Sialoi v. City of San Diego, 823 F.3d 1223, 1232 (9th Cir. 2016).  Such a stop must be justified by reasonable suspicion.  Id.  Reasonable suspicion must be grounded in specific and articulable facts, as well as reasonable inferences from those facts, which indicate that the particular person is engaged in criminal activity.  United States v. Lopez-Soto, 205 F.3d 1101, 1105 (9th Cir. 2000).  An officer may rely on his training and experience when drawing inferences from the facts he observes.  Id.

The government first argues that the officers were in a high crime area.  But the Court must perform a careful examination before labeling an area as "high-crime" because such a description can easily serve as a proxy for race or ethnicity.  United States v. Montero-Camargo, 208 F.3d 1122, 1138 (9th Cir. 2000).  Any such designation must be properly limited and factually based. Id.  Courts must be particularly careful that the "high crime" area factor "is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business, but is limited to specific, circumscribed locations where particular crimes occur with unusual regularity."  Id.  The government seems to argue that the entire Bayview district is a high crime area.  MTS Opp'n (dkt. 24) at 16 (citing Freeman Decl. ¶ 6; Smally Decl. ¶ 6).  While the record does not precisely describe the boundaries of the Bayview district, it appears that this is a substantial area.  See Incident Report at 4 of 5 (describing just the Bayview 5 car sector as encompassing the area east of 3rd Street and south of Quesada Avenue).  Labeling the

United States District Court
Northern District of California

United States District Court
Northern District of California

entire Bayview district as "high crime" would run afoul of the Ninth Circuit's admonition that this label should not be used "with respect to entire neighborhoods or communities." See Montero-Camargo, 208 F.3d at 1138.

The government's evidence also does not contain sufficient facts to allow the Court to conduct the kind of factually based examination mandated by Montero-Camargo. Id. The government relies only on the officers' declarations that the Bayview District was "known for" violent crime and that there were "frequent" shootings. Smally Decl. ¶ 6; Freeman Decl. ¶ 6. These general statements do not carry the government's burden. See Montero-Camargo, 208 F.3d at 1139 n.32 ("more than mere war stories are required to establish the existence of a high crime area").

Though the Court does not conclude that the officers encountered Mr. Howard in a high crime area, the declarations and bodycam footage submitted in this case demonstrate that the officers still had ample justification for an investigatory stop. First, Mr. Howard's manner of driving justifiably raised the officers' suspicions. In Illinois v. Wardlow, the Supreme Court ruled that "unprovoked flight upon noticing the police" could justifiably raise an officer's suspicion. 528 U.S. 119, 124 (2000). Furthermore, a suspect's disregard for traffic rules and safety may factor into an officer's reasonable suspicion that criminal activity is afoot. See United States v. Velez, No. 15-CR-00102-WHA, 2015 WL 3465738, at *3 (N.D. Cal. June 1, 2015). Here, Mr. Howard accelerated through a stop sign and took a left turn at a high rate of speed after the officers pulled in behind him. See Freeman Decl. ¶ 8–9; Smally Decl. ¶ 8–9. This justifiably raised the officer's suspicions. See Freeman Decl. ¶ 9; Smally Decl. ¶ 9. While Mr. Howard's briefing argues that he committed no traffic violations, Mr. Howard has not submitted a declaration or other evidence to challenge the officers' sworn statements. MTS Reply at 1–2. Second, Mr. Howard's destination also justifiably raised the officers' suspicions. In People of Territory of Guam v. Ichiyasu, the Ninth Circuit ruled that a well-dressed suspect coming from a dead-end road in an industrial area justifiably struck the officer as "out of place" and could factor into the officer's reasonable suspicion for a stop. 838 F.3d 353, 356 (9th Cir. 1988). In striking similarity to the facts of Ichiyasu, Mr. Howard had driven down a muddy dead-end road in an

industrial area while well-dressed in a "clean, matching sweat suit with bright-white shoes that were now caked in mud." Freeman Decl. ¶ 10, 12; Smally Decl. ¶ 10, 13; Smally BWC at 0:30. The officers could justifiably conclude that Mr. Howard appeared to be out of place in this area and factor this into their reasonable suspicion. See Freeman Decl. ¶ 13; Smally Decl. ¶ 13. Third, Mr. Howard's behavior at the scene further raised the officers' suspicions. After turning onto Armstrong Avenue, Mr. Howard left his vehicle in the middle of the road with the door open and the engine running. Freeman Decl. ¶ 12; Smally Decl. ¶ 12. He then ran into some bushes by the side of the road where he apparently scratched his face. Incident Report at 4 of 5; Smally Decl. ¶ 16. By any measure, this is unusual behavior.

From Mr. Howard's suspicious driving, suspicious destination, and suspicious behavior at the scene, the officers were justified in concluding that Mr. Howard had likely fled from them, driven to a deserted area, and rapidly exited his car to discard some kind of contraband. See Freeman Decl. ¶ 14; Smally Decl. ¶ 14; Lopez-Soto, 205 F.3d at 1105 ("An officer is entitled to rely on his training and experience in drawing inferences from the facts he observes, but those inferences must also be grounded in objective facts and be capable of rational explanation") (internal quotations omitted). For these reasons, the officers' decision to conduct an investigatory stop was justified.

### 2.      Mr. Howard's Arguments

Mr. Howard makes a number of arguments for why these facts are insufficient to justify an investigatory stop. None are convincing.

Mr. Howard argues that the officer's justification for an investigatory stop was incomplete because he was seized when the officers activated their overhead lights. MTS Reply at 2–3. Mr. Howard claims that, when the officers activated their lights, they did not yet know that his car was still running, that his shoes were muddy, or that he looked out of place in that area. Id. at 2. However, whether or not there was reasonable suspicion for the investigatory stop when the officers activated their lights, the officers had also observed Mr. Howard commit a traffic violation. See Freeman Decl. ¶ 8–9; Smally Decl. ¶ 8–9. The traffic violation provided sufficient justification for the initial stop, even if the justification for the investigatory stop emerged

United States District Court
Northern District of California

1    moments later.  See United States v. Evans, 786 F.3d 779, 788 (9th Cir. 2015) ("an officer may

2    prolong a traffic stop if the prolongation itself is supported by independent reasonable suspicion").

3         Mr. Howard argues next that flight from police is a problematic factor in the reasonable

4    suspicion analysis because Mr. Howard is a Black male who reasonably seeks to avoid contact

5    with the police.  MTS Reply at 3.  Mr. Howard cites United States v. Brown, 925 F.3d 1150 (9th

6    Cir. 2019), as support.  MTS Reply at 3.  He also points to his own statements at the scene that he

7    feared the police because they "shoot people."  Freeman BWC at 6:19–6:33.  However, Brown

8    only cautions that flight from police is insufficient on its own to authorize a stop.  See Brown, 925

9    F.3d at 1157.  As explained above, flight is just one of the facts supporting the officers' reasonable

10   suspicion that Mr. Howard had discarded contraband.

11        Mr. Howard also argues that running out of his car and into some bushes on the side of the

12   road is equally consistent with needing to use the bathroom as with discarding contraband.  MTS

13   Reply at 9.  However, Mr. Howard's behavior is far more consistent with criminal activity than

14   with needing to use the bathroom.  It stretches credulity that Mr. Howard ran a stop sign, made an

15   unsafe turn, and then ran out of his car, leaving the car running and the door open in the middle of

16   the street, all just to use the bathroom.  Regardless, the officers need not "rule out the possibility of

17   innocent conduct" to establish reasonable suspicion.  Navarette v. California, 572 U.S. 393, 403

18   (2014) (quoting United States v. Arvizu, 534 U.S. 266, 277 (2002)).

19              **3.    Request for an Evidentiary Hearing**

20        Mr. Howard is not entitled to an evidentiary hearing on the lawfulness of the stop.

21        An evidentiary hearing on a motion to suppress is required if the moving papers are

22   sufficiently definite, specific, detailed, and nonconjectural to enable the Court to conclude that

23   contested issues of fact going to the validity of the search or seizure are at issue.  United States v.

24   Walczak, 783 F.2d 852, 857 (9th Cir. 1986).  However, "defense counsel's mere refusal to accept

25   the uncontradicted evidence does not create a material issue of fact requiring an evidentiary

26   hearing."  United States v. Woodson, No. 11-CR-00531-WHA, 2011 WL 5884913, at *6 (N.D.

27   Cal. Nov. 23, 2011).

28        Mr. Howard claims that there are disputed issues of fact regarding his purpose for driving

United States District Court
Northern District of California

United States District Court
Northern District of California

down Armstrong Avenue.  MTS Reply (dkt. 28) at 2.  He points to his statements on the scene that he had driven down Armstrong Avenue to use the bathroom.  Id.  However, Mr. Howard's claimed purpose does not conflict with any of the factual predicates justifying the investigatory stop.  The investigatory stop is predicated on Mr. Howard running a stop sign, making a high speed turn, driving to a muddy dead end street in an industrial area, and quickly exiting his car, leaving it in the middle of the road with the engine running and the door open, to run into some bushes on the side of the road.  Supra pp. 10–11.  Mr. Howard's true purpose for doing these things is not one of the factual predicates for the stop.  See United States v. Alexander, No. 5:18-cr-00349-EJD-1, 2020 WL 4818613, at *3 n.1 (N.D. Cal. Aug. 19, 2020) (holding that the issue on a motion to suppress is whether the officer had sufficient reason to conduct the stop, not whether the officer's suspicion was ultimately correct).

Mr. Howard also attempts to dispute the officers' claim that he committed traffic violations.  MTS Reply at 1.  However, Mr. Howard has not submitted his own declaration regarding these events and has not pointed to any evidence in the record that contradicts the officers' declarations.  MTS Reply at 1–5.  Mr. Howard argues that the officers did not behave as if he had committed traffic violations because they did not activate their lights earlier and never issued Mr. Howard a traffic ticket.  Id.  But this highly conjectural argument does not justify an evidentiary hearing.  See United States v. Small, 664 F.Supp. 1357, 1363 (N.D. Cal. 1987) (holding that allegations of bad faith based only on the timing of a warrant application were conjectural and did not require an evidentiary hearing).

For these reasons, the Court will not hold an evidentiary hearing on the lawfulness of the stop.

### B.    Duration of the Stop

Mr. Howard argues that the officers unlawfully prolonged his detention.  But the duration of Mr. Howard's detention was reasonably necessary to investigate the officers' suspicion that Mr. Howard had discarded contraband.

A stop "can last only as long as is reasonably necessary to carry out the mission of the stop."  United States v. Gorman, 859 F.3d 706, 714 (9th Cir. 2017) (internal quotations omitted).

1    While the stop is ongoing, officers must diligently pursue investigative means to confirm or dispel

2    their suspicions.  United States v. Sharpe, 470 U.S. 675, 686 (1985).

3           Mr. Howard argues that the officers should not have detained him while searching for

4    contraband.  MTS at 6.  But as explained above, the officers had ample facts from which to

5    suspect that Mr. Howard had discarded contraband.  Therefore, they could detain Mr. Howard

6    while they diligently attempted to confirm or dispel their suspicions.  See Sharpe, 470 U.S. at 686.

7           Mr. Howard also argues that the officers "mill[ed] around" and were not diligent in

8    carrying out the search for a three-minute period before backup units arrived.  MTS at 6.  Not so.

9    During the time that Mr. Howard alleges the officers were "mill[ing] around," Officer Freeman

10   went to search for any discarded contraband by the side of the warehouse, communicated with

11   dispatch about the registration status of Mr. Howard's car, and questioned Mr. Howard about his

12   suspicious behavior.  Freeman BWC at 3:41–6:40; Freeman Decl. ¶ 15.  As Officer Freeman

13   searched by the side of the warehouse, Officer Smally stayed by the police vehicle to watch Mr.

14   Howard and communicate with backup units.  Smally BWC at 3:19–5:26.  When Officer Freeman

15   returned, Officer Smally entered the police vehicle to perform a wants and records check on the

16   vehicle's computer terminal.  Id. at 5:47–6:00; Smally Decl. ¶ 18.  In all, the bodycam footage

17   reveals that the officers were diligently investigating the basis for the investigatory stop during the

18   entirety of this three-minute period.

19          Mr. Howard further argues that it should have taken mere moments to search the area next

20   to the warehouse where the officers first saw Mr. Howard when they pulled onto Armstrong

21   Avenue.  MTS at 6–7.  Mr. Howard contends that the officers' decision to search a larger area

22   extending around the side of the warehouse and behind a fence unreasonably prolonged his

23   detention.  Id.  As support, Mr. Howard cites Officer Freeman's comments that other officers were

24   searching in the wrong place and that Mr. Howard "never made it that far."  Freeman BWC at

25   14:16–14:24.  However, the bodycam footage reveals that the area next to the warehouse where

26   Officer Freeman believes Mr. Howard stopped is only a few feet away from the edge of the

27   warehouse and the fence behind which Officer Smally and the other officers are searching.

28   Freeman BWC at 14:16–14:18.  From that spot, Mr. Howard could have easily thrown contraband

United States District Court
Northern District of California

14

1    over the fence as Officer Smally suspected.  Smally BWC at 4:11–4:19; Smally Decl. ¶ 17.  Given

2    Mr. Howard's proximity to the fence when the officers first spotted him, the officers were justified

3    in prolonging the detention to search around the side of the warehouse and behind the fence.

4    　　　　Finally, Mr. Howard requests an evidentiary hearing regarding the duration of the stop.

5    MTS at 7.  However, there is no particular material fact in dispute on this point.  Even if Officer

6    Freeman is correct that Mr. Howard only made it to the side of the warehouse, Mr. Howard was

7    still close enough to the fence to throw contraband over it.

8    　　　　For these reasons, Mr. Howard's detention was not unlawfully prolonged, and no

9    evidentiary hearing is required.

10   　　　　**C.　　　Lawfulness of the Questioning**

11   　　　　The officers' questioning on the scene did not constitute a custodial interrogation for

12   Miranda purposes.  To trigger Miranda rights, the suspect must be (1) in custody and (2) subject to

13   an interrogation.  Siripongs v. Calderon, 35 F.3d 1308, 1319 (9th Cir. 1994).  Here, neither

14   requirement is met.

15   　　　　　　**1.　　　Custody**

16   　　　　A suspect detained during an investigatory stop is not in custody for Miranda purposes.

17   United States v. Butler, 249 F.3d 1094, 1098 (9th Cir. 2001).  However, an investigatory stop may

18   convert into Miranda custody "if there is a formal arrest or restraint on freedom of movement of

19   the degree associated with a formal arrest."  California v. Beheler, 463 U.S. 1121, 1125 (1983)

20   (internal quotations omitted).  Courts look to several factors to make this determination: "(1) the

21   language used to summon the individual; (2) the extent to which the defendant is confronted with

22   evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the

23   detention; and (5) the degree of pressure applied to detain the individual."  United States v.

24   Bassignani, 575 F.3d 879, 883 (9th Cir. 2009).  The ultimate question is whether the police have

25   taken measures that would "cause a reasonable person to feel that he or she will not be free to

26   leave after brief questioning—i.e., that indefinite custodial detention is inevitable."  United States

27   v. Guzman-Padilla, 573 F.3d 865, 884 (9th Cir. 2009).

28   　　　　Mr. Howard argues that the officers confronted him with evidence of his guilt.  MTS at 8.

15

However, the dialogue reproduced above reveals that the officers merely asked Mr. Howard to explain his suspicious behavior and challenged his answers where they did not make sense.  See, e.g., Freeman BWC at 5:31–5:33 ("What you run for?") 5:36–5:41 ("You didn't?  Why you got scratches?  You got your Air Maxes all muddy") 5:56–5:59 ("So, you didn't see us, so you just ran for no reason into the mud?").  This questioning is consistent with the targeted questioning permitted during an investigatory stop, not a confrontation with known facts suggesting guilt.  Cf. U.S.A. v. Magdirila, No. 2:17-CR-00729-CAS-1, 2018 WL 1472498, at *11 (C.D. Cal. Mar. 22, 2018), aff'd sub nom. United States v. Magdirila, 962 F.3d 1152 (9th Cir. 2020) (holding that the defendant was in custody where officers discovered contraband in his vehicle and confronted him with that contraband during questioning).

Mr. Howard next argues that the officers applied a high degree of pressure by boxing in his car, handcuffing him, taking his identification, and summoning seven additional officers to the scene.  MTS at 8.  However, under the circumstances, these measures are consistent with an investigatory stop.  In United States v. Cervantes-Flores, an officer saw a pedestrian flee into the desert after spotting the officer's marked patrol vehicle.  421 F.3d 825, 828 (9th Cir. 2005) (overruled on other grounds).  The officer caught the fleeing suspect, handcuffed him, and brought him back to the road.  Id.  The Ninth Circuit held that this use of handcuffs "did not convert the Terry stop into a custodial arrest" because the suspect had "demonstrated an intention to evade arrest."  Id. at 830.  Here, boxing in Mr. Howard's car, handcuffing him, and taking his identification were measures consistent with an investigatory stop because Mr. Howard had already demonstrated an intent to flee.  Cf. Magdirila, 2018 WL 1472498, at *11 (holding that the defendant was in custody where officers handcuffed him and placed him in a police vehicle even though he had not attempted to flee).  Mr. Howard's car remained running with the door open for the duration of the stop, giving him a potential avenue for escape if the officers had not taken these precautions.  Smally Decl. ¶ 12; Freeman Decl. ¶ 12.  Furthermore, the number of officers at the scene does not significantly weigh towards custody because most of those officers were present to help search for contraband.  See Freeman Decl. ¶ 17; Smally Decl. ¶ 19.  Except for Officer Smally and Officer Freeman, none of them interacted extensively with Mr. Howard.  See Freeman

16

BWC 6:57–14:09; Smally BWC 11:30–12:17.

Mr. Howard also argues that the physical surroundings of this encounter weigh towards custody. MTS Reply at 16. He argues that the location was "well away from the public view, in a remote area where no passersby would likely be present." Id. (internal quotations omitted). This is an exaggeration. While Armstrong Avenue is an industrial area, people can be seen working nearby. Freeman BWC at 1:50–2:10. The location was not a traditional police-dominated atmosphere. See United States v. Chong, No. 15-CR-00176-AB, 2015 WL 5156438, at *13 (C.D. Cal. Sept. 2, 2015), aff'd in part, 720 F. App'x 339 (9th Cir. 2017) ("short detention in a public parking lot in broad daylight" not custodial). Furthermore, Mr. Howard was the one who chose to stop at that location. In all, the physical surroundings of the encounter are a neutral factor.

The duration of this detention also weighs against custody. Less than fifteen minutes elapse from when the officers detain Mr. Howard to when Officer Smally finds the gun and Mr. Howard is arrested. Smally BWC at 0:30–14:52. This is a relatively short period of detention. See United States v. Davis, 530 F.3d 1069, 1081–82 (9th Cir. 2008) (holding that a detention involving questioning by several different officers, each for five to fifteen minutes, was not too long.)

The language used to summon is not relevant here. Mr. Howard was detained, not summoned.

In addition to the Bassignani factors, there was another indication that would cause a reasonable person to believe that he would be "free to leave after brief questioning." See Guzman-Padilla, 573 F.3d at 884. In one exchange, Officer Freeman explicitly told Mr. Howard that he would "probably not" be arrested if the search for contraband came up empty. Freeman BWC at 10:14–10:20. Because "[t]he 'reasonable person' test presupposes an innocent person," a reasonable person in Mr. Howard's position would believe, based on Officer Freeman's words, that he would soon be released. See Florida v. Bostick, 501 U.S. 429, 438 (1991).

For these reasons, the totality of the circumstances indicate that Mr. Howard was not in Miranda custody during any of the on scene questioning.

United States District Court
Northern District of California

### 2.     Interrogation

An "interrogation" under Miranda refers to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).  Questioning during an investigatory stop does not constitute an interrogation when limited to brief inquiries that are reasonably related to the justification for the stop.  United States v. Kim, 292 F.3d 969, 976 (9th Cir. 2002).

None of Mr. Howard's statements were the product of interrogation.  Some of his statements were in response to brief inquiries that were reasonably related to the justification for the stop.  The other statements were voluntary or the product of small talk.  Mr. Howard's responses to questions asking him who the car belonged to, why he ran, why he drove to that spot, why his shoes were muddy, and why his face were scratched were not in response to interrogation because these questions are the kinds of brief inquiries that are reasonably related to the justification for the stop.  See Davis, 530 F.3d at 1082 (holding that questions aimed at obtaining information to confirm or dispel the suspicion that the suspect was part of a marijuana growing operation were of a kind "normally permissible" during an investigatory stop and therefore did not require Miranda warnings).  Mr. Howard also made several unsolicited statements in response to overhearing conversations between officers.  Freeman BWC at 10:57–11:28; Smally BWC at 2:35–2:45, 4:44–4:46.  These statements were not in response to interrogation.  See Innis, 446 U.S. at 302 (holding that a conversation between two officers within the suspect's earshot did not constitute interrogation).  Lastly, Mr. Howard and Officer Freeman engaged in a short conversation about "Oceola."  Freeman BWC at 10:31–10:53.  Mr. Howard argues that the "Oceola" conversation was aimed at learning information regarding "unsolved criminal activity." MTS Reply at 19.  But this argument is conclusory and not supported by any evidence.  The exchange reads much more like "casual conversation" that was especially unlikely to elicit an incriminating response.  See Mickey v. Ayers, 606 F.3d 1223, 1235 (9th Cir. 2010) (holding that small talk during a plane ride about topics largely unrelated to the investigation did not constitute interrogation).

United States District Court
Northern District of California

1    For these reasons, none of the statements Mr. Howard made at the scene were the product

2    of interrogation.

3    **D.    Abandonment**

4    In supplemental briefing, the government and Mr. Howard contest whether, assuming that

5    Mr. Howard had possession of the firearm, he abandoned it by leaving it behind the warehouse.

6    Supp. Brief; Supp. Response.  If Mr. Howard abandoned the gun, he would not have standing to

7    contest its seizure.  See United States v. Garcia, 909 F.2d 389, 391 (9th Cir. 1990).  But Mr.

8    Howard's original briefing did not claim that the police acted illegally when they seized the

9    firearm.  Instead, Mr. Howard sought suppression of the gun only as the fruit of his own allegedly

10   illegal detention.  MTS Reply at 11.  This does not create an abandonment issue because Mr.

11   Howard clearly has standing to contest the detention of his own person.  See Moreno v. Baca, 431

12   F.3d 633, 641 (9th Cir. 2005).  Furthermore, even abandoned property may be suppressed if police

13   obtain the property as the fruit of a separate constitutional violation.  See United States v.

14   McClendon, 713 F.3d 1211, 1214, 1217 (9th Cir. 2013) (where defendant abandoned a handgun,

15   he could still argue that the police obtained it as the fruit of his illegal seizure or of an earlier

16   illegal search).  To the extent that Mr. Howard's supplemental briefing now challenges the seizure

17   of the firearm as a standalone constitutional violation, the Court concludes that Mr. Howard

18   abandoned the firearm and does not have standing to contest its seizure.

19   A person has no standing to challenge the search or seizure of their voluntarily abandoned

20   possessions.  Garcia, 909 F.2d at 391.  Abandonment is primarily a question of intent.  United

21   States v. Jackson, 544 F.2d 407, 409 (9th Cir. 1976).  However, this intent is judged by an

22   objective standard and can be inferred from "words, acts and other objective facts."  United States

23   v. Kendall, 655 F.2d 199, 201 (9th Cir. 1981) (quoting Jackson, 544 F.2d at 409).

24   Assuming that Mr. Howard possessed the firearm found on the scene, he abandoned it

25   when he left it in an enclosed area next to a warehouse.[1]  In United States v. Woodson, the court

26

27   ───────────────
     [1] At oral argument, the parties disputed whether or not Mr. Howard had tossed the gun over the

28   fence.  But no legal conclusions turn on whether the gun was "tossed" or "placed" on the other
     side of the fence.

concluded that "[p]hysical relinquishment of control" was sufficient on its own to prove abandonment, even though the defendant had tried to hide the contraband under a bush.  No. CR 11-00531 WHA, 2011 WL 5884913, at *8 (N.D. Cal. November 23, 2011).  Many other cases come to a similar conclusion.  See, e.g., United States v. Snowden, No. 1:16-CR-00031-DAD-BAM, 2017 WL 633899, at *16 (E.D. Cal. February 15, 2017) (holding that defendant abandoned gun when he placed it under an SUV and walked away); United States v. McLaughlin, 525 F.2d 517. 519 (9th Cir. 1975) (holding that discarding contraband from a moving vehicle constituted abandonment).  Furthermore, an established line of cases holds that individuals cannot claim a reasonable expectation of privacy over areas that they have no right to control.  See United States v. Nohara, 3 F.3d 1239, 1242 (9th Cir. 1993) ("an apartment dweller has no reasonable expectation of privacy in the common areas of a building"); United States v. Gonzalez, 328 F.3d 543, 547 (9th Cir. 2003) (hospital employee had no expectation of privacy in hospital mailroom because he had no right to exclude others from the room).  That Mr. Howard relinquished physical control of the gun and the gun was found behind a fence on property not belonging to Mr. Howard clearly shows abandonment.

The defense does not cite any cases that disturb this conclusion.  The defense cites to United States v. Bonds, a case where a passenger wrapped drugs in an item of clothing and handed that item to a friend.  No. CR-12-01105-TUC-CKJ, 2012 WL 5188014, at *2 (D. Ariz. Sept. 4, 2012).  There, the court concluded that the drugs had not been abandoned.  Id. at 3.  Bonds is part of a line of cases that hold that passing property off to an acquaintance does not constitute abandonment.  See, e.g., United States v. Bell, No. 2:15-RC-54 JCM (CWH), 2016 WL 155027, at *2 (D. Nev. Jan. 13, 2016) (defendant who passed a backpack to his wife did not abandon the backpack).  That fact pattern has little to do with this case.  The defense also cites United States v. Mulder, 808 F.2d 1346 (9th Cir. 1987).  Mulder involved a bag left at a hotel room past the checkout date.  Id. at 1348.  However, that case expended only a paragraph of analysis on the abandonment issue, and the Ninth Circuit relied on the defendant's card having been charged an extra night to find that the luggage had not been abandoned at the time he tried to reclaim it.  Id. From these individual cases, the defense has succeeded in identifying certain narrow exceptions to

the general rules that a defendant abandons property when he relinquishes physical control of that property, or when he leaves that property in a place which he does not control. However, this case does not present facts falling into these narrow exceptions.

For these reasons, assuming that Mr. Howard possessed the firearm, the objective facts show that Mr. Howard abandoned it and therefore has no standing to contest its seizure.

## IV.    CONCLUSION

For the foregoing reasons, the Court denies Mr. Howard's motion to suppress.

**IT IS SO ORDERED.**

Dated: March _9_, 2021

CHARLES R. BREYER
United States District Judge